THE BIRDSELL MANUFACTURING COMPANY v. FRANK E. BROWN AND JOHN SEHLER.

*Principal and agent—Contract—Breach—Damages—Promise to indorse.*

1. The relation of principal and agent is not changed as between the parties, nor as between the principal and a third person, by the failure of the agent to observe secret instructions given him by the principal.

2. An agent cannot be held as an indorser upon a mere promise to indorse, but, if the promise is made upon a sufficient consideration, an action may be maintained for its breach.

3. Where an agent sells and delivers a machine without having a full settlement with the purchaser, and taking his notes for the purchase price, as required by the contract of agency and the instructions of the principal, the measure of damages, as against the purchaser, is the price of the machine, and, as against the agent, compensation for the injury sustained by his failure to perform his agreement and follow the instructions given.

4. The defendants, who were agents of the plaintiff for the sale of clover hullers, are held not to have made themselves liable for the value of a huller sold and delivered without securing the notes of the purchaser, and returned by the purchaser to the defendants, and, after being stored for a time, reshipped by them to the plaintiff, under the facts stated in the opinion, a reference to which is necessary to a correct understanding of the questions decided.

Error to Kent. (Grove, J.) Argued March 8, 1893. Decided June 23, 1893.

*Assumpsit.* Defendants bring error. Reversed. The facts are stated in the opinion.

*Ward & Ward,* for appellants.

*Stuart & Knappen,* for plaintiff.

McGRATH, J. Defendants were acting as plaintiff's agents for the sale of clover hullers at Grand Rapids, under a written agreement dated December 29, 1888, by the terms of which defendants agreed—

To receive, and take good care, by storing under shelter, of all machines sent to them as such agents; and, should any machine sent to them remain unsold at the end of the season, to store the same under cover until the next season, or return the same to plaintiff.

"To take all orders on blanks furnished by the party of the first part, and to have the same properly filled and signed, showing property statement of purchaser, and to use all due diligence in ascertaining the correctness of such property statements, and to forward orders without delay for acceptance or rejection.

"To receive the purchase price of all machines sold as aforesaid, whether in money or notes, and to forward the same to the said party of the first part promptly, and at the time of settlement of each sale.

"That all moneys and notes and other securities taken for said clover separators (or parts thereof) are to be received by said parties of the second part in a fiduciary capacity, and not otherwise, and so accounted for; and said moneys, notes, and securities are in no case to be

used or appropriated by said parties of the second part, but are to belong (as soon as received by said parties of the second part) exclusively to said party of the first part, and to be promptly remitted to it as each settlement is made.   *   *   *   *   *   *   *   *   *

"To invariably have full settlement with the purchaser before the delivery of each machine, or any part thereof.

"To be personally responsible for any neglect of the faithful performance of any of the requirements embraced in this agreement.

"To sell only at such prices and on such terms as said party of the first part shall direct, and hereby guarantee payment for machines sold, unless said parties of the second part shall, before sale, send an order to the said party of the first part, with property statement of the purchasers thereon, and such order shall be accepted by it. Such order shall be in the form of a proposal, and may be accepted or rejected by said party of the first part."

On October 3, 1889, defendants sent a telegram to plaintiff at South Bend, Ind.; as follows:

"Will you ship one huller, two January's time, good paper, our indorsement?   Answer quick when can ship."

On the same day plaintiff replied:

"Will ship huller on that time, and can ship next Monday.   Instruct us."

Defendants on the same date gave the following instruc- tions:

"Ship the huller Monday next, as stated."

The huller was shipped on October 7, and on that date plaintiff sent to defendants the following bill:

"CLOVER-HULLER DEPARTMENT. ⎱
"SOUTH BEND, IND., Oct. 7, 1889. ⎰
"BROWN & SEHLER, Grand Rapids, Mich.,
"In commission account with Birdsell Manufacturing Co.
"Order No. 2,969.   Machine No. 13,999.
"One No. 1 clover huller, trucks, and stacker, 9½ pulley, $470.
"Commission 20 per cent., payable at time and in same propor- tion as we receive our money, per contract.
"For terms ———.
"If sold on time, sale to be made subject to our approval, per contract.
"Transferred from ———." •

The huller was delivered to the person for whom it was obtained, one Van Amburg. The notes were not obtained from the purchaser. On November 14, 1889, defendants wrote plaintiff as follows:

" *Gentlemen:*
" The last huller shipped us does not seem to work right, and we are unable to get settlement for it. We are no experts on huller business, but the party we sold to had worn out one of your hullers before, and said that he had no trouble whatever in cleaning the seed; but with this he cannot get the seed through the sieve; keeps a man at the sieve all the time, and then it will run over so that they have to stop and clean it out. If the man is not there all the time, it will load up and run over. Think will have to send a man who understands his business, to see what can be done with it, before we can get settlement. Any time about the 20th of the month will be all right for him to come, as the man is sick now, and would rather not start under a week. Let us hear from you by return mail what day a man can come, so that we can write him to be ready."

On November 19, 1889, plaintiff replied as follows:

" *Gentlemen:*
" You wrote us the other day that you needed an expert to look after one of your hullers. You also spoke about the party being sick who wanted help, and that he will not likely be able to work before the 20th. The weather being so bad, and the party sick, it will be best for you to telegraph us when everything is ready for starting the machine.
" You say he has trouble about getting the seed through the sieve. Do you mean the recleaner or the wire shoe? It is quite likely that if he would lower the tail board as low as possible behind, and put on plenty of wind, he will have no trouble whatever about the shoe clogging up. Tell him he need not be uneasy about blowing over seed. If the trouble is with the recleaner, perhaps the screens need washing off. Sometimes they get dirty or gummy, and the holes thereby become too small for letting the seed through properly. If the cylinder concaves are properly adjusted, and the tail board kept down behind, and plenty of wind let on, we have no doubt but that everything

will run all right.    It is quite likely that some of his belts are too loose.    We inclose cut with one of the belts marked in red ink.    If he will keep this belt good and tight, and the fan belt also tight, we are quite sure he will need no expert."

On November 22, 1889, defendants wrote again to plaintiff as follows:

" *Gentlemen:*
"Answering yours of Nov. 19, would say that it will be necessary to send a man to see to this huller, as the customer has got balky.    You can send a man at any time within a week if it stops raining, and we will see then what can be done."

After this letter was written, and on Nov. 30, one Altland, a representative from the home office, visited Grand Rapids, saw defendants, and also Van Amburg.    At that conversation Van Amburg told Altland that he would not settle for the machine until it was made to give satisfaction.    Altland says:

" I proposed to Van Amburg that we could try the machine, and he agreed to it, and set the 27th day of December for us to be here, to have an expert to show how the machine would work."

On December 7, 1889, plaintiff wrote defendants as follows:

"*Gentlemen:*
" Our Mr. E. W. Altland reports that Mr. Van Amburg does not expect to start up his huller again until between Christmas and New Year's.    If convenient, we wish you would notify us either by letter or wire about three days before he desires to start the machine, giving the exact day, if possible, and we will have some one there to see that it operates properly.    From what Mr. Altland says we are satisfied that the trouble lies exactly where we wrote you in our last letter.    All that will be necessary in this case will be to lower the concave, or take out all of the teeth except one row, if the clover is dry enough, and then lower the tail board at the rear end of the machine, and turn on plenty of wind.    If that is done, the shoe

will be kept clean, and the huller will work to everybody's entire satisfaction."

To this letter defendants replied, December 8, as follows:

"*Gentlemen:* The arrangement your Mr. Altland made with Mr. Van Amburg is that they were to start the huller on Friday between Christmas and New Year's, and that you were to have a man there at that date."

On December 14, 1889, defendants again wrote to plaintiff as follows:

" *Gentlemen:*

" Mr. Van Amburg, who has the huller that is unsettled for, called yesterday, to let us know that since he had been away from home there had another huller come in, and done all of the work in his neighborhood, including the job that the machine was to have been tried on. He says that there is no use in talking, if he should keep the huller, he could never get work to do with it in that country again. He makes a proposition to deliver the huller back here, lose his freight, and pay $50 for what he has damaged it. This, he says, is all that he will or can do. He is perfectly responsible for a dozen hullers, and we have had a great amount of deal with him, and always found him perfectly straight; but he is very head-strong and set in his way, and when he gets an idea that a thing is not right it is impossible to change it. If you wish to accept his proposition, you may have the $50, and carry the huller in stock here until another year. He will clean the huller up; and, as it has never hulled but a few days, thinks it is not damaged. We should judge that this would be the best way out of the trouble, but, if you have any other idea in the matter, perhaps you had better send Mr. Altland back here to talk to him, as we have done all we possibly can to get the settlement. Please let us hear from you by return mail, so that we can close the matter up one way or the other."

On December 16, 1889, plaintiff replied, refusing to accept the proposition, and stating that—

" The facts of the case are that the machine was shipped to you, for we did not know whom, on October 7

last, which we did on a telegraph order from you, in which you stated that you would indorse the paper. We heard nothing further in regard to this machine until November 14, under which date you wrote us that the machine did not seem to work as it should, and that you were unable to get settlement for same. You also stated that the trouble seemed to be in the mill. When Mr. Altland called upon you recently he reported fully in regard to this matter, and said that there was not the least doubt in the world but what the machine was all right. He also further stated that Mr. Van Amburg now expects to quit the threshing business on account of his eyes, and says, were it not for this, he is of the opinion that Mr. Van Amburg would not take the position he has in the matter. * * * To sum up this matter as above stated: The machine was sent without any order, and on your guaranty, and we shall look to you for the payment for the huller, on your guaranty on the paper taken for it. We regret very much that this matter has taken the shape that it has, and are inclined to the opinion that, had you taken Mr. Van Amburg's order for the machine, or settled for it when he took it, this action on his part would have been avoided."

To this letter defendants replied as follows:

"*Gentlemen:*

"Yours of the 16th is at hand, and contents noted, and in answer to same will say that ours of the 14th was not a request, as you seem to take it, but was merely a statement of what Mr. Van Amburg's proposition was, and what our idea of the matter was. * * * As for Mr. Van Amburg's quitting the threshing business, will say that he hasn't the least idea of doing so. As we wrote you before, Mr. Van Amburg intended to have the machine tried on the Friday between Christmas and New Years. He was here in the city on jury at the time this agreement was made, and, when he went home at the end of the week, found that another machine had got in and done the work, so that there is no job left to try it on.

"As regards our ordering the machine, will say that we don't go back on ordering the machine, nor on making good our order, but, until you make the machine work satisfactorily or to fulfill your guaranty, you will not be able to get pay for it. * * * If you wish to have

anything done with Mr. Van Amburg you can send one of your representatives to interview him."

In March, 1890, Van Amburg, between two days, took the huller back to Grand Rapids, and left it in front of defendants' place of business. After it had remained there for some time, defendants, to protect it, placed it under cover. After this, and in April, plaintiff's agent, Altland, again visited Grand Rapids, and, with the knowledge of the disposition made of the huller, called upon Van Amburg in person and alone, and demanded a settlement for the huller, but Van Amburg refused to pay. On November 13, 1890, defendants wrote to plaintiff as follows:

" *Gentlemen:*

"There still remains in stock here, belonging to you, the No. 1 huller formerly ordered for Mr. Van Amburg. We notified your Mr. Altland when here last winter that Mr. Van Amburg had returned the huller, and asked to have an order for shipment of the huller. We have, according to contract, stored the machine under cover up to the present time, and have never received an order from you for the return of the machine. We now consider that we have stored the machine longer than our contract requires, and we now need the store room. The machine is here, subject to your order, and, according to terms of the contract, we trust you will give us shipping orders for this at once, as we do not think that we should be called upon to store it longer."

No reply was made to this letter, and in August, 1891, defendants shipped the huller back to plaintiff, but plaintiff refused to receive it, and what became of it does not appear. This suit was then brought.

The court instructed the jury as follows:

1. "The evidence in the case does not show that there was a sale from the plaintiff to the defendants of this clover huller; but it does show, under the construction which I feel bound to place on the agreement, namely, the telegrams in connection with the contract of agency, that these defendants, in sending forward the telegram that was first read, acted as the agents of the plaintiff in this suit.     *     *     *     *     *     *     *     *     *     *

2. " In this contract of agency there is a provision that the party of the first part—that is, the plaintiff in this suit—agreed to furnish to the said parties of the second part—that is, the defendants in this suit—such number of clover separators manufactured by the said party of the first part as the said parties of the second part may be able to sell as its agents prior to January 1, 1890; the said party of the first part reserving unto itself the right, in case it shall not be able to fill all orders sent it by the parties of the second part, to restrict said parties of the second part to such number of machines as it may be able to supply, even though the terms and conditions of orders received at the office may be accepted, and acknowledged, and shipment promised. This provision in the contract, as well as the fact that resort is had to the mode of business between the parties to construe that phrase of the first telegram to which I have called your attention, among other things, has led me to the conclusion to interpret and construe these telegrams together with this original contract, and to hold that whatever contract was made in reference to this huller was by the defendants, as agents, with the plaintiff, as their principal; in other words, that it was on their part done, and on the part of the plaintiff understood as done, with reference to their duties as agents, and under this contract of agency.

3. "If there is any recovery by or on the part of the plaintiff in this suit, it must be under the fourth count of the declaration; and the fourth count charges these defendants, as agents, under the agreement that was put in evidence of the contract of agency. It sets forth the agreement; it sets forth that contract of agency; it sets forth as a part of the agreement that the plaintiff at the special instance and request of the defendants—It sets forth that on, to wit, the 3d day of October, 1889,—

" ' In consideration that the said plaintiff at the special instance and request of said defendants would deliver to them, the said defendants, on, to wit, the 7th day of October, 1889, at Grand Rapids, in the State of Michigan, aforesaid, one of plaintiff's number one clover hullers, on the terms that defendants should accept said huller at a certain price, to wit, at the price of $470, and would have full settlement with the purchaser thereof for the same before the delivery thereof to him, and take in payment therefor the two promissory notes of the purchaser thereof, each for one-half of said amount, and one of said notes to become due on January 1, 1890, and the other of said notes to become due on January 1, 1891, and both to be indorsed by defendants and delivered to plaintiff, to wit, within 60 day from October 3, 1889; and the said defendants then and there, on the day and year last aforesaid, undertook and promised the plaintiff to take, sell, settle, and pay for said clover huller accordingly.'

"That is the agreement set forth in this count of the declaration substantially; and then it is averred that, in reliance upon that agreement and undertaking on the part of the defendants, the

plaintiff did, on the 7th day of October, deliver to the defendants said clover huller, on the terms and conditions aforesaid, and that the defendants sold and delivered it to William Van Amburg. Now follows the allegation in the declaration as to the breach by the defendants of the agreement set forth in the declaration. And the allegation of breaches of that agreement is as follows:

"'That the said defendants, not regarding their said promise and undertaking, but contriving and intending to deceive said plaintiff, did not have full settlement, or any settlement, with said purchaser, to wit, said William Van Amburg, for said huller, before the delivery thereof to him, but, on the contrary, delivered the same to him, said Van Amburg, without any settlement whatever; and said defendants did not, although often requested so to do, take from said purchaser, to wit, said Van Amburg, and deliver to plaintiff, the promissory notes above mentioned, or any notes whatever, for said clover huller, although more than 60 days have elapsed since the delivery of said huller to said defendants, and the sale by them to said Van Amburg; but without authority, and contrary to the express direction of said plaintiff, said defendants received back said huller from said Van Amburg, and attempted to relieve him, said Van Amburg, of all liability therefor.'

"Substantially the averments of the breaches of the agreement relied upon by the plaintiff are the 'neglect to have a settlement before the delivery of the machine; the neglect to take notes for the payment from the purchaser, and indorse them and deliver them to the plaintiff within 60 days; and the averment that without authority, and contrary to the express directions of the plaintiff, the defendants received the huller back, and attempted to relieve Van Amburg of all liability therefor. Now, it is under this count of the declaration that the plaintiff must recover, if it recovers at all; and the claim on the part of the defendants is that this machine, being a clover huller manufactured by the plaintiff, and sold by the plaintiff, through its agents, the defendants, to Van Amburg, and delivered to Van Amburg, carried with it an implied warranty that it was reasonably fit for the purpose for which it was designed, and that it was not reasonably fit for that purpose; in other words, that it would not do the work that a clover huller is intended to do,—would not do it properly. And it is further claimed on the part of the defendants that they, as agents, did all that was required of them under this contract; and that, as soon as they ascertained that the machine had been tested, and that it was claimed by the purchaser, Van Amburg, that it would not perform the work, they notified the plaintiff, and gave the plaintiff an opportunity to send a man forward here and put the machine in working order, and make it work if it would. Undoubtedly the plaintiff had a right to such a notice, and had a right to have the opportunity, when informed that the machine would not do the work, to attempt to put it in working order, to

make it work. And there is a question for you to consider in this case whether or not it was afforded sufficient opportunity—reasonable opportunity—so to do; and upon the part of the defendants, that Mr. Van Amburg gave timely notice to them, and that they gave the notice to the plaintiff. It is claimed on the part of the plaintiff that it was not afforded a reasonable opportunity; that, in fact, it was prevented.

4. "Now, it is a rule of law that, in the case of a sale of machinery, such as a clover huller, an implied warranty accompanies it that the machine is reasonably fit—suitable—to do the work for which it is designed and sold. The questions in this case, then, are whether or not this machine was reasonably fit to do the work for which it was intended; and the burden is upon the defendants, so far as that is material to the issue, to show that this huller was so imperfect that it could not reasonably be made to do the work for which it was intended.

5. "The averments in the declaration in regard to the neglect of the defendants to make settlement, and to take these notes, are, under the testimony, fully established. There was no settlement made. It is a conceded and undisputed fact in the case that there was no settlement, and also an undisputed fact in the case that no notes were taken. The huller came here, and it was delivered to Van Amburg on his oral order that he gave in the first instance. He tested it, and he claimed that it did not do the work. The plaintiff claims that it would do the work if it had an opportunity to give it a fair trial. Now, these averments, that I say are undisputed, do not render the defendants liable, unless their breach of them caused the damage that the plaintiff has sustained; unless the injury which the plaintiff claims resulted or flows from the breach of those averments, it would not follow that the defendants are liable. It would not make very much difference whether the settlements were had and notes taken or not if the purchaser were perfectly solvent, and payment could be enforced against him; and, if there was a sale in this case to Van Amburg that would bind Van Amburg, then the plaintiff in this case could enforce it against Van Amburg, and the mere omission to take the notes, or to have settlement at the time, would not be the cause of any damage.

6. "But it is claimed in this case on the part of the plaintiff that, if Van Amburg was liable at all, these defendants released him from the liability by receiving back (they being agents of the plaintiff) and by accepting this huller on Van Amburg's claim that it did not fulfill the implied warranty which I have mentioned, and therefore on that it seeks to recover against these defendants for a breach of their duty on this contract as agents. Now, if you find from the testimony that this machine could be reasonably

made to do the work for which it was intended, then Van Amburg would have no right to return it. That alone would not be sufficient to entitle the plaintiff to recover in this action,—merely finding that Van Amburg had no just reason to return it. Merely finding as a fact that the machine was capable of doing the work for which it was intended would not be sufficient to entitle the plaintiff to recover in this action, in my judgment; because, if he had not any right to return it, it could easily enforce the sale against him, and he would be the proper man to sue and recover from, in my judgment. But if, in addition to finding, if you should find it to be a fact, that the machine could be reasonably made to do the work for which it was intended,—if, in addition to that these defendants, without authority from the plaintiff, or contrary to its express directions, received the huller back from Van Amburg, and attempted to relieve Van Amburg of all liability therefor, and did relieve him by accepting it back,—then the defendants are liable. And I think as a matter of law, if Van Amburg set up the claim that the machine did not fulfill the implied warranty, that it was not capable of doing what it was intended to do; if on that claim he sought to return it, and did return it, to the defendants, and they accepted it,—then Van Amburg would be released. The plaintiff would be bound by that act of its agents. Van Amburg would be released; and, if these defendants did not have just cause for releasing him, they would render themselves liable. In other words, if the machine could be reasonably made to do its work by the plaintiff, and it had not omitted opportunity, when it was afforded it, to do it, then there would be no right to return it.

"The defendants claim, however, that they did everything that they could; that they tried to get a settlement; that they acted as agents for their principal, and kept in mind the interest of their principal as well as their own; and they claim that the testimony shows that the huller would not do the work. If you find, then, these two propositions in favor of the plaintiff: If you find that the machine could be reasonably made to do the work, and that these defendants accepted it back when they ought not to have done it, had not any right to do it, and relieved Van Amburg from liability, then your verdict will be for the plaintiff; otherwise not.     *     *     *     *     *     *     *     *     *     *     *

7.  "*A Juror:* I would like to ask a question, if not improper. Would it be considered, in law, any acceptance of it back in the manner in which it was returned according to the evidence?

"*The Court:* Well, in that regard, if you find from the evidence that the machine was returned by Van Amburg, and left in front of or near the premises of the defendants without their consent, without their knowledge; that they notified the plaintiff of its

return; that they took it under cover merely for the purpose of protecting it and sheltering it, under the provision in the contract which required them to shelter machines kept over,—it would not be an acceptance, that of itself; but, in determining whether or not there was an acceptance, you should consider all the testimony in the case, consider all the efforts that were made on the part of the defendants to make a collection for the machine. You may consider whether any communication or interview was had between them and Van Amburg, or any understanding whatever between them, in that regard, and what they did in regard to notifying the plaintiff, and in regard to sending the machine back, and the time it was sent back,—all these facts and circumstances."

The learned circuit judge was right in holding that whatever contract was made in reference to the huller was made by defendants as agents for plaintiff. That relation was at no time changed, nor was the relation between plaintiff and Van Amburg altered by the failure on the part of defendants to observe secret instructions. Van Amburg seems to have been financially responsible. This record contains no evidence of collusion between defendants and Van Amburg; nothing that is not consistent with entire good faith on the part of the defendants. If plaintiff has suffered any damage, it would seem to be because it has not pursued Van Amburg. Defendants could not be held as indorsers upon a mere promise to indorse. If, however, the promise to indorse is made upon a sufficient consideration, an action may be maintained for the breach. 2 Pars. Notes & B. 15; 1 Daniel, Neg. Inst. § 689a; Tied. Com. Paper, § 264; *Fenn v. Harrison*, 3 Term R. 757; *Moxon v. Pulling*, 4 Camp. 50; *Bank v. Houston*, 1 Har. (Del.) 225; *French v. Turner*, 15 Ind. 59. If defendants were liable under the agreement fixing the terms of the agency, they were liable as guarantors.

The claim against Van Amburg belonged to plaintiff, and not to defendants. Even the authority to sue must have proceeded from plaintiff, and any suit brought against Van Amburg must have been brought in the name of

96 Mich.—15.

plaintiff. Plaintiff's remedy against defendants was for a breach of agreement. The measure of plaintiff's damage, as against Van Amburg, was the price of the machine, while, as against defendants, it was confined to the injury sustained by failure to follow instructions. The difficulty here grows out of the attempt to make the agents primarily liable, and to cast upon them the purchaser's burden, in addition to that arising out of the agreement of agency. Defendants' guaranty was not against litigation, nor against claims that the machines were not up to the implied warranty. The same defense could be made to an action on the notes. Defendants, on November 14, 1889, notified plaintiff that they had been unable to get a settlement with Van Amburg. Plaintiff made no objection on that ground until a month afterwards, but in the mean time sent on its adjusting agent, who made a distinct arrangement with the purchaser to be present on December 27, and make a trial of the machine. If Van Amburg had no defense, or did not furnish an opportunity for the trial, or if he desired to avoid the contract, plaintiff was fully advised of all the facts. Defendants were not insurers against that situation. The remedy against Van Amburg was simple. Plaintiff alone could pursue it. Instead of pursuing Van Amburg, plaintiff, on December 16, 1889, notified defendants that it would look to them for the value of the machine. Why? Not because defendants had not collected in advance the contract price, but simply because Van Amburg had not given, and defendants had not required, the notes in advance. The huller was at this time in Van Amburg's possession, and remained in his possession some three months thereafter.

The matter rested until some time in March, 1890, when Van Amburg, between two days, brought the machine to Grand Rapids, and left it exposed in front of defend-

ants' premises. After some time, defendants, to protect the machine, put it under cover. It cannot be contended that this act on the part of defendants was a release of Van Amburg. Plaintiff was notified of this move, and its representative afterwards saw Van Amburg, and demanded a settlement for the huller. Nothing further was done until November 13, 1890, when the letter of that date was written to plaintiff. No reply was made, and in August, 1891,—one year and ten months after the sale, and nine months after the letter of November 13, 1890, was written,—defendants shipped the huller back to plaintiff. Plaintiff had made no move against Van Amburg, nor against any one. Indeed, it had written to defendants, one year and nine months before this time, that it did not intend to look to Van Amburg, but to them, for the value of the machine. Defendants had written to plaintiff for instructions, and had waited nine months for a reply. Defendants were entitled to instructions, if plaintiff desired to save its rights as against Van Amburg, after having announced that it did not intend to pursue him, and plaintiff cannot now be heard to say that this act of defendants made them liable to it for the value of the machine.

The judgment is reversed, and a new trial granted.

The other Justices concurred.